## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON

CASEY RYGH,

      Plaintiff,

v.                               Case No. 2:12-cv-07387

MARGARET CLIFFORD, Lieutenant,
DAVID BALLARD, Warden,
JIM RUBENSTEIN, Commissioner,
JOHN DOE, Officers,

      Defendants.

### PROPOSED FINDINGS AND RECOMMENDATION

On November 5, 2012, the plaintiff filed a Complaint under 42 U.S.C. § 1983, alleging that, on August 17, 2012, he was subject to excessive use of force by the defendants through the use of a "stinger grenade" and a chemical agent, and that he was subsequently placed in four-point restraints for a period of "almost 8 hours." (ECF No. 2.) Pending before the court is the defendants' Motion for Summary Judgment. (ECF No. 22). This matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).

### PLAINTIFF'S ALLEGATIONS AND FACTUAL BACKGROUND

The plaintiff is serving a life sentence, without mercy, after being convicted in 1997 of two counts of first degree murder and one count of conspiracy to commit robbery or attempted robbery in the Circuit Court of Logan County, West Virginia. On

or about August 16, 2012, the plaintiff was moved to the Quilliams II unit at the Mount Olive Correctional Complex ("MOCC").  He was housed in Pod 8, Cell 815.  On August 17, 2012, after hours of continually asking for and being denied the opportunity to go to the recreation yard, the plaintiff asked to speak to the officer in charge.  Approximately 30 minutes later, a correctional officer returned to the plaintiff's cell and told him that the lieutenant in charge refused to talk to him.  (*Id.* at 5).  Lunch was subsequently served, after which the plaintiff refused to return his food tray until the officer in charge came to see him.  (*Id.*)

At that point, Lieutenant Margaret Clifford, the Assistant Shift Supervisor, came to the plaintiff's cell.  The plaintiff alleges that she requested that he return his tray or "she would have the plaintiff wish [he] had given it back."  (*Id.* at 5-6).  The plaintiff further alleges that he asked Clifford why he had been consistently denied recreation and that he would not return his tray until she answered him.  (*Id.* at 6).  Clifford did not respond and left the pod.  (*Id.*)  The plaintiff claims that he became aggravated and began pacing around in his cell.  (*Id.*)

Approximately 30 minutes later, Clifford returned with an extraction team and demanded that the plaintiff give her the tray and cuff up in order to be extracted from his cell.  (*Id.*)  The plaintiff refused to do so, unless Clifford discussed why he had not been allowed to go to recreation.  (*Id.*)  At that point, Clifford opened the plaintiff's food tray slot ("bean hole") and a stinger grenade was thrown into the plaintiff's cell.  After the grenade exploded, Clifford again ordered the plaintiff to comply with the extraction procedures and the plaintiff again refused to do so.  (*Id.*)

The plaintiff alleges that Clifford again opened his bean hole and sprayed "an excessive amount" of chemical agent into his cell and slammed the bean hole shut.  (*Id.*)

Several minutes later, Clifford again ordered the plaintiff to "cuff up" and "come out," but the plaintiff again refused.  The plaintiff alleges that Clifford sprayed a second round of chemical agent into his cell.  (*Id.*)  At that time, the plaintiff said he couldn't breathe and he agreed to comply with the order to be extracted.  (*Id.*)

The plaintiff alleges that he was placed in restraints and escorted to the multi-purpose room, where he was placed in a 4-point restraint chair for almost eight hours, after which he was returned to his cell, which had not been cleaned.  (*Id.* at 7).  The plaintiff alleges that the deployment of the stinger grenade, multiple rounds of chemical agent, and placing him in 4-point restraints for eight hours was "unwarranted, unnecessary, unjustified, excessive, sadistic and malicious."  (*Id.*)

The plaintiff alleges that he suffered "physical and psychological pain and was traumatic and harmful."  (*Id.*)  He further claims that, for several weeks, he experienced: (1) anxiety, (2) panic, (3), rage, (4) sleep disturbances or deprivation, (5) paranoia, (6) burning of the eyes, face, neck and overall body and (7) discomfort.  (*Id.*)

The plaintiff alleges that Clifford and other John Doe defendants, who have never been specifically identified by the plaintiff, knew or should have known that their actions were not authorized under West Virginia Division of Corrections ("WVDOC") policies, and were unconstitutional.  He further alleges that the John Doe defendants failed to act to prevent Clifford from engaging in this unconstitutional conduct.  (*Id.* at 7-8).  The plaintiff further alleges that the use of the extraction team was unnecessary and that Clifford and the John Doe defendants could have come into his cell and simply taken his tray away.  (*Id.* at 8).

The plaintiff further contends that defendants Ballard and Rubenstein have "consistently and with deliberate indifference ignored numerous prisoners['] cries for

help." (*Id.* at 8-9).  The plaintiff further alleges that these defendants, via the grievance process, have actual or constructive knowledge of intentional, malicious and sadistic actions taken by their subordinates, and have allowed, ignored and given tacit authorization for such conduct.  (*Id.* at 9-10).

The plaintiff contends that this deliberate indifference by Ballard and Rubenstein is evidenced by their one-line affirmances of grievance denials, without proper investigation, and the fact that there has been little to no disciplinary action taken against officers found to have violated WVDOC and MOCC policies and procedures.  (*Id.* at 10).  Thus, the plaintiff alleges that Ballard and Rubenstein "are liable for their deliberately indifferently failure to properly, sufficiently and adequately act, discipline and otherwise address or respond properly to the grievances and complaints of the plaintiff and other inmates, which have promoted and permitted malicious and sadistic denial of prisoners' rights (especially this plaintiff) and physical and psychological emotional abuse." (*Id.*)

The plaintiff's Complaint alleges that the defendants' conduct violated his rights under the First, Fifth, Sixth, Eight and Fourteenth Amendments to the United States Constitution.  (*Id.* at 25).  He seeks monetary damages from the defendants in their individual capacities, as well as various forms of declaratory and injunctive relief. [1]  (*Id.* at 25-26).

On March 21, 2013, United States Magistrate Judge Mary E. Stanley entered an Order and Notice, setting deadlines for discovery and dispositive motions.  (ECF No.

---

[1]  On May 20, 2013, the presiding District Judge granted the defendants' Motion for Judgment on the Pleadings (ECF Nos. 15, 31), and dismissed the plaintiff's claims for monetary damages against all of the defendants in their official capacities, because they are immune from such liability under the Eleventh Amendment to the United States Constitution.  The plaintiff's claims for monetary damages against the defendants in their individual capacities, and his claims for declaratory and injunctive relief are still pending.

19).  In the Order and Notice, the plaintiff was advised, pursuant to the holding in *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), of his right and obligation to respond to any motion for summary judgment filed by the defendants.  (*Id.*)

Before the discovery period ended, the defendants filed a Motion for Summary Judgment (ECF No. 22), and a Memorandum of Law in support thereof (ECF No. 23), alleging that the undisputed record in existence at that time demonstrated that the defendants are entitled to judgment as a matter of law on all of the plaintiff's claims.

On April 15, 2013, the plaintiff filed an Objection to the defendants' Motion for Summary Judgment, claiming that it was prematurely filed in light of the court's March 21, 2013 Order and Notice.  (ECF No. 25).  On April 29, 2013, the defendants filed a Response to the plaintiff's Objection.  (ECF No. 28).  Notwithstanding his Objection to the defendants' Motion for Summary Judgment, on May 9, 2013, the plaintiff filed a Declaration in Opposition to the defendants' Motion for Summary Judgment and a Statement of Disputed Factual Issues.  (ECF Nos. 29 and 30).

On June 14, 2013, the undersigned entered an Order stating that Rule 56(b) of the Federal Rules of Civil Procedure allows for the filing of a motion for summary judgment "at any time until 30 days after the close of all discovery," unless otherwise ordered by the court.  Fed. R. Civ. P. 56(b).  (ECF No. 33).  The undersigned's Order further noted that the prior Order and Notice with a schedule for discovery was not intended to require the defendants to wait until the close of discovery to move for summary judgment, if they believed an earlier motion was warranted.  (*Id.*)  Thus, the defendants' motion was not improperly filed.  Nevertheless, the undersigned gave the plaintiff until July 1, 2013 to either provide an affidavit or declaration specifying additional information he believed to be necessary to defend against the defendants'

5

motion, or to file an additional response to the motion.  (*Id.*)  The Order also set a deadline of July 8, 2013 for the defendants' reply memorandum.  (*Id.*)

The plaintiff did not file any affidavit or declaration stating that he needed additional discovery by July 1, 2013.  Rather, on or about June 19, 2013, the plaintiff served a set of requests for production of documents on the defendants (ECF No. 35), which were responded to on or about July 18, 2013 (ECF No. 37) and, on August 2, 2013, the plaintiff filed another Response to the defendants' Motion for Summary Judgment (ECF No. 38).  The defendants filed a Reply on August 9, 2013.  (ECF No. 39).

Although the plaintiff's Response was filed after the deadline in the undersigned's June 14, 2013 Order, because the plaintiff's discovery requests were answered after that deadline, but still within the allotted discovery period, an extension of the deadlines for the Response and Reply was warranted.  Accordingly, the Response and Reply briefs should be considered timely.  The Motion for Summary Judgment is now ripe for adjudication.

## **STANDARD OF REVIEW**

In evaluating summary judgment motions, Rule 56(a) of the Federal Rules of Civil Procedure provides:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a) (2010).  Material facts are those necessary to establish the elements of a party's cause of action.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant.  *Id.*  The moving party has the burden of establishing that there is an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute.  *Overstreet v. Kentucky Cent. Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir. 1991).

Rule 56(c)(1) of the Federal Rules of Civil Procedure provides that:

A party asserting that a fact cannot be or is genuinely disputed, must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B)  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  Subsection (e) of Rule 56 provides that, if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the court may:  (1) give the parties an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and undisputed supporting materials show that the movant is entitled to it; or (4) issue any other appropriate order.  Fed. R. Civ. P. 56(e).

A court must not resolve disputed facts, weigh the evidence, or make determinations of credibility.  *See Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986);

*Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995).  Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor.  *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  However, the party opposing the motion may not rely upon mere allegations or denials of the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Sprenkle v. Hartford Life Ins. Co.*, 84 F. Supp. 2d 751 (N.D. W. Va. 2000).

## STATEMENT OF RELEVANT FACTS

The defendants' Memorandum of Law focuses on the plaintiff's behavioral history while in the custody of the WVDOC.  The defendants note that, in February of 2009, the plaintiff was flagged as an escape risk due to information that he was planning to escape with other inmates.  (ECF No. 22, Ex. 1 at 2).  The plaintiff acknowledges that he has been labeled an escape risk, but denies ever attempting or having plans to escape. (ECF No. 38 at 1).

In March of 2010, a portion of a reciprocating saw blade was found in and removed from the plaintiff's cell.  (ECF No. 22, Ex. 1 at 3).  The defendants note that the plaintiff also has a history of fighting with other inmates, including a fight that occurred on March 16, 2010.  (*Id.*, Ex. 1 at 4).  The plaintiff asserts that, since December of 1997, he has only had two write ups for fighting.  (ECF No. 38 at 1).

The defendants further note that, in the days leading up to the incident that is the subject of this Complaint, the plaintiff, who was then housed on the Quilliams I unit, was causing problems.   On August 14, 2012, an institutional hearing was held

8

concerning a rule violation charging the plaintiff with "trafficking."  This charge resulted from a review of one of the plaintiff's telephone calls which revealed his plan to have drugs mailed to him by another inmate's girlfriend.  (*Id.*, Ex. 2).  The plaintiff was found guilty of the charge, resulting in his loss of privileges, including the loss of his personal television and other items.  (*Id.*)  After the plaintiff threatened to bust up his television, he was moved to the Quilliams II unit, which is the most restrictive unit at MOCC.  (*Id.*, Ex. 3 at 1, ¶ 3).

On August 17, 2012, Lt. Margaret Clifford ("Clifford") was serving as the Assistant Shift Supervisor.  (*Id.*, ¶ 4).  According to Lt. Clifford, because the plaintiff was a new transfer to the unit, she could have refused to allow him to have recreation for a 72-hour period, but chose not to do so.  (*Id.* at 2, ¶ 6).

Just prior to the incident involving the plaintiff, however, the administration at MOCC changed the manner in which recreation took place.  (*Id.*, ¶ 7).  Under the new policy, inmates were paired up for recreation based upon the administration's determination of who they thought would be able to get along.  Accordingly, at times, it took longer to get inmates out to the recreation yard and sometimes an inmate would be passed up for another inmate to be part of a specific recreation group.  (*Id.*)  In addition to trying to take each of the inmates on the unit to the recreation yard, on August 17, 2012, staff members on the Quilliams II unit were also tending to a small flood that had occurred as a result of inmates flooding their cells by backing up their toilets.  (*Id.*, ¶ 8).

According to the evidence submitted by the defendants, at approximately 11:00 a.m. on August 17, 2012, Clifford was advised by C.O. II Michael Bunch ("Bunch") that the plaintiff was kicking his cell door with enough force to activate the light indicating

an unsecure door. (*Id.*, ¶ 9; ECF No. 22, Ex. 4 at 2). Bunch advised Clifford that he had tried to get the plaintiff to stop kicking his door. (ECF No. 22, Ex. 3 at ¶ 9).

Clifford went to the Quilliams II unit and spoke to the plaintiff. (*Id.*, ¶ 10). At that time, a meal had been served to the inmates on the unit, and the plaintiff was refusing to return his meal tray. Clifford attempted to get the plaintiff to return his tray, and he continued to refuse to return it. (*Id.*) According to Clifford, the plaintiff stated, "Talking is over. Come and get me." (*Id.*) Clifford further states that this statement was a clear indication to her that it would be necessary to extract the plaintiff from his cell. (*Id.*) Clifford further states that the plaintiff was also violating facility rules by covering the window of his cell, thus preventing Clifford and other staff from seeing inside his cell. (*Id.*)

According to facility protocol, Clifford contacted Associate Warden of Security Paul Parry ("Parry") to obtain permission to extract the plaintiff from his cell and to use a restraint chair. (*Id.* at 3, ¶ 11). Clifford states that, after discussing the options, Parry approved the use of a sting ball grenade and Oleoresin Capsicum spray ("OC spray"). (*Id.*; ECF No. 4 at 4). The affidavit does not discuss whether use of the restraint chair was approved. (*Id.*) The Cell Extraction Approval Form provided as an exhibit by the defendants does not specify the tools or techniques that were approved for use by AWS Parry. (ECF No. 22, Ex. 4 at 4). However, a Memorandum summarizing the incident and the force used that was prepared by Lt. Clifford for Robert Rhodes, the Chief Correctional Officer on Friday, August 17, 2012, states:

> I phoned Paul Parry AWS and received permission to use Calculated
> Force, and the restraint chair to gain compliance from inmate Rygh due to
> him kicking the door with enough force that it could result in an escape
> from the cell, or destruction of state property, and him having a tray that
> could be used as a weapon.

(ECF No. 22, Ex. 4 at 5).

Clifford assembled a cell extraction team and made arrangements for the cell extraction process to be videotaped, according to the Policy Directive 313.02. (ECF No. 22, Ex. 3 at 3, ¶ 12; ECF No. 22, Ex. 7; ECF No. 24, Ex. 5). According to Clifford, the extraction team, which included a nurse to provide any necessary medical care, was briefed and then went to the plaintiff's cell. (*Id.*)

Clifford states that she made one more request for the plaintiff to return his food tray, but he refused. Thus, she opened his food tray slot and a sting ball grenade was deployed by Cpt. John Nottingham ("Nottingham") at Clifford's command. (ECF No. 22, Ex. 3 at 3, ¶ 12; ECF No. 22, Ex. 4; ECF No. 24, Ex. 5).

After the deployment of the sting ball grenade, the plaintiff still refused to comply with the orders to return his tray and submit to the cell extraction procedures. (ECF No. 22, Ex. 3 at 2, ¶ 12; Ex. 4 at 2; ECF No. 24, Ex. 5). According to Clifford, an attempt was then made to use the OC spray, but the canister did not initially work. Thus, a second attempt to use the OC spray was used, which was successful. (ECF No. 22, Ex. 3 at 2, ¶ 12; ECF No. 22, Ex. 4 at 2; ECF No. 24, Ex. 5). After that, the plaintiff became compliant, removed the covering from his cell window, and submitted to the procedures to cuff up and be extracted. (ECF No. 22, Ex. 3 at 3, ¶ 12).

Following the cell extraction, the plaintiff was escorted to the recreation yard where he was examined by the nurse and cleaned up. (ECF No. 22, Ex. 3 at 3, ¶ 13; ECF No. 22, Ex. 4 at 2). Then, the plaintiff was placed in a restraint chair for six hours in the medical unit. (ECF No. 22, Ex. 3 at 3, ¶ 13; ECF No. 22, Ex. 4 at 2; ECF No. 24, Ex. 5). While in the restraint chair, the plaintiff was checked every 15 minutes and was permitted to use the bathroom and to eat. (ECF No. 22, Ex. 6). Clifford states that

protocol allows for use of the restraint chair for up to eight hours but, after six hours, she felt the plaintiff seemed compliant, and was returned to his cell at 6:10 p.m.  (ECF No. 22, Ex. 3 at 3, ¶ 13; ECF No. 22, Ex. 4 at 3; ECF No. 22; Ex. 6).  These facts as presented by the defendants are confirmed by the video recording.  (ECF No. 24, Ex. 5).

Following this use of force incident, each staff member involved completed an incident report detailing his or her role and recollections.  (ECF No. 22, Ex. 4).  An internal review of the use of force incident was reviewed by the Use of Force Committee on August 20, 2012, and a report of its findings was generated.  (ECF No. 22, Ex. 4). The Committee's report concluded that (1) the officers' use of force was applied in a good faith effort; (2) there was a need for the force used and it was not excessive; (3) the threat was reasonably perceived and acted upon by correctional staff; (4) reports that were written/filed by staff involved reflect that the use of force was within agency policy, procedure and training; and (5) this committee does not recommend additional action be taken as a result of this incident.  (ECF No. 22, Ex. 4 at 3).

As noted in the defendants' Memorandum of Law, the parties' versions of the facts appear to differ in two material respects.  First, the plaintiff alleges that two rounds of OC spray were deployed, while the defendants assert that the first attempt to use the spray was unsuccessful, and only the second attempt resulted in the actual disbursement of OC spray into the plaintiff's cell.  (ECF No. 2 at 6; ECF No. 22, Ex. 3, ¶ 12; ECF No. 22, Ex. 4 at 2, 5, 6).  The defendants' version of these facts is supported by the video recording.  (ECF No. 24, Ex. 5).

Second, the plaintiff alleges that he was kept in the restraint chair for eight hours, while the defendants maintain that he was restrained for six hours.  The record supports a finding that the plaintiff was kept in the restraint chair from 12:15 p.m. to 6:10 p.m.

(ECF No. 22, Ex. 6).   The undersigned notes that the plaintiff also asserts that he stopped kicking his cell door hours before the defendants claim that he did.   The plaintiff acknowledges, however, that he repeatedly refused to return his food tray and that he covered his cell window, in violation of facility policies.

## ANALYSIS

The defendants' Memorandum of Law in support of their Motion for Summary Judgment asserts:

> The Plaintiff cannot prevail on any claim asserted in his Complaint as a matter of law because the actions of Lt. Clifford did not violate the Plaintiff's rights under the Eighth, First, Fifth, Sixth or Fourteenth Amendments.   Furthermore, Lt. Clifford is entitled to qualified immunity for all actions taken, as they were not in violation of clearly established law.   Warden Ballard and Commissioner Rubenstein are entitled to summary judgment because the Plaintiff has presented no set of facts under which they could be found to have personally violated the Plaintiff's constitutional rights, and there is no vicarious liability for constitutional violations.

(ECF No. 23 at 7).   The undersigned will address each of the plaintiff's claims and the defendants' arguments in turn.

### A.    The plaintiff's Eighth Amendment claims.

The defendants first assert that the deployment of a stinger grenade and OC spray into the plaintiff's cell by the defendants on August 17, 2012, and the subsequent restraint of the plaintiff in a chair for six hours, was a reasonable amount of force under the circumstances, and was done in a good faith effort to restore order in the prison unit.   Accordingly, the defendants assert that the plaintiff cannot successfully establish that any of the defendants violated his Eighth Amendment rights.

The plaintiff's Complaint and the summary judgment papers primarily focus on the conduct of Lt. Clifford.   However, the plaintiff's Complaint also alleges that various

John Doe officers failed to stop the use of force from happening, and that they knew or should have known that their actions and those of Lt. Clifford posed a substantial risk to plaintiff's safety, welfare and health.  (ECF No. 2 at 23).

Although it appears that the names of the other officers who participated in the plaintiff's cell extraction are readily available from the written and video evidence, the plaintiff has never identified the John Doe defendants, and they have not been served with process.   Nevertheless, because the unnamed officers were acting under the command of and pursuant to the orders of Lt. Clifford, it stands to reason that, if there was no Eighth Amendment violation based upon Clifford's conduct, there is no liability on the part of the John Doe officers either.

In *Farmer v. Brennan*, 511 U.S. 825, 832 (1994), the Supreme Court held that the Eighth Amendment to the Constitution "imposes duties on [prison] officials who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"  This is a low standard.  The Supreme Court emphasized that "[p]rison conditions may be 'restrictive and even harsh.'" *Id.* at 833.

In *Hudson v. McMillan*, 503 U.S. 1 (1992), the Supreme Court held that use of excessive physical force against an inmate may constitute cruel and unusual punishment even when the inmate does not suffer serious injury.  The Court held "that whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley [v. Albers*, 475 U.S. 312 (1986)]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  503 U.S.

14

at 6.   The majority opinion noted that "[t]he objective component of an Eighth Amendment claim is therefore contextual and responsive to 'contemporary standards of decency.'" 503 U.S. at 8. [Citation omitted.]

> In the excessive force context, society's expectations are different. When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.   [Citation omitted.] This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.   Such a result would have been as unacceptable to the drafters of the Eighth Amendment as it is today. * * *
>
> That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action. [Citation omitted.]  The Eighth Amendment's prohibition of "cruel and unusual" punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort "repugnant to the conscience of mankind." [Citations omitted.]

*Id.*, at 9-10.  Near the conclusion of the opinion, Justice O'Connor wrote: "To deny, as the dissent does, the difference between punching a prisoner in the face and serving him unappetizing food is to ignore the 'concepts of dignity, civilized standards, humanity and decency' that animate the Eighth Amendment."  *Id.*, at 11.

The Supreme Court, however, rejected an argument that an objective test of deliberate indifference be established.

> We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837.  Thus, to sustain an Eighth Amendment claim, a prisoner must show two things: (1) "the deprivation must be, objectively, 'sufficiently serious;'" that is, "denial of 'the minimal civilized measure of life's necessities;'" and (2) the prison official

had a "'sufficiently culpable state of mind;'" that is, "'deliberate indifference' to inmate health or safety." *Id.* at 834. (Citations omitted.)   The negligent failure to protect inmates from violence will not suffice. *Pressly*, 816 F.2d at 979.

In *Whitley v. Albers*, *supra*, the Supreme Court identified five factors to be used in determining whether a particular use of force was excessive.   Those five factors are: (1) the need for application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury; (4) the threat reasonably perceived by the responsible official; and (5) any efforts made to temper the severity of a forceful response.   475 U.S. at 321; *Williams v. Benjamin*, 77 F.3d 756, 762 (4th Cir. 1996).

The *Whitley* case involved a riot at the Oregon State Penitentiary where a prison officer was taken hostage.   In an attempt to free the hostage, a plan was put in place for an unarmed prison security manager to enter the cell block where the hostage was being held, followed by prison officers armed with shotguns.   The security manager ordered one of the armed offers to fire a warning shot and to shoot low at any inmates found climbing the stairs in the direction of the security manager.   During this rescue attempt, one of the officers shot an inmate in the left knee.   The inmate filed suit in federal court, and at the conclusion of a jury trial, the District Court directed a verdict for the defendants.   The Court of Appeals subsequently reversed that ruling and remanded the case to the District Court for a new trial.   The Supreme Court granted certiorari, and ultimately found no Eighth Amendment violation.

The *Whitley* Court noted that:

[I]n making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and

16

prison staff, in addition to the possible harms to inmates against whom force might be used.

475 U.S. at 320.   The Supreme Court has further emphasized that, "prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."   *Id.* at 321-22 (quoting *Bell v. Wolfish*, 441 U.S. at 547).   Thus, the Court stated that "[u]nless it appears that the evidence viewed in the light most favorable to the plaintiff will support a reliable inference of wantonness in the infliction of pain, under the standard we have described, the case should not go to the jury."   *Id.* at 322.

The defendants' Memorandum of Law states:

> In this matter, the facts bearing upon whether the force applied was in violation of the Plaintiff's constitutional rights is largely undisputed. [Footnote omitted].  It is clear from the record that the force applied was not malicious or sadistic as described in *Whitley*.

(ECF No. 23 at 7-8).   The defendants' Memorandum then addresses each of the five *Whitley* factors in relation to the facts of the plaintiff's case.   (*Id.* at 8-11).

The defendants maintain that the plaintiff's own actions of kicking his door with enough force to activate the light indicating that the door was not secure, and refusing to return his food tray when asked, necessitated the use of force.   (*Id.* at 8).   The defendants note that they could not feasibly enter the plaintiff's cell without his compliance, and that the plaintiff could have used the tray as a weapon.   (*Id.*)   The plaintiff also violated facility rules by obstructing his window, so that staff could not see inside of his cell.   (*Id.*)   Further, the defendants contend that the plaintiff's comment that "Talking is over.  Come and get me," demonstrates the plaintiff's awareness that the

consequence of his continued refusal to comply with orders was the forcible removal from his cell. (*Id.*)

The defendants' Memorandum further asserts that Lt. Clifford complied with Policy Directive 313.02 for a calculated use of force. (*Id.*) Clifford discussed the options with AWS Paul Parry and a cell extraction was approved. (*Id.*) The conduct of Clifford and the other staff was in compliance with that policy, including the videotaping of the extraction. (*Id.*) The defendants further assert that "[a]ll of this force was deemed necessary by the prison officials involved in the process, was upheld by a subsequent administrative investigation, and followed applicable penological procedures." (*Id.*) Thus, the defendants assert that the first *Whitley* factor concerning the need for the use of force has been met. (*Id.* at 9).

The defendants further assert that the amount of force in this case "was commensurate with the objective sought to be obtained, which was to gain compliance from the inmate in response to security-related instructions (specifically, to stop kicking the door of his cell, to return his lunch tray, and to remove the covering from the window in his cell), and to recover state property that could potentially be used as a weapon." (Id. at 9). The defendants further assert that, when the sting ball grenade did not achieve the plaintiff's compliance, the deployment of the OC spray was necessary to get the plaintiff to comply with orders and submit to extraction. (*Id.*)

The defendants further assert that "[p]lacing the inmate in the restraint chair was employed as an additional means of making the inmate compliant to instructions." (*Id.*) They further contend:

> However, it was not malicious or sadistic, as the inmate was given the opportunity to use the bathroom, and to eat, and his restraints were checked regularly to ensure that they were not causing injury to the

inmate.  ([ECF No. 22,] Ex. 6, Intensive Supervision Log, August 17, 2012).
When balanced against the threats to security that were caused by the
Plaintiff's actions, the procedurally correct and lawful use of force against
him was certainly justified.

(ECF No. 23 at 9).

The defendants further assert that the third prong of the *Whitley* test, concerning

the extent of the plaintiff's injury, weighs strongly in favor of the defense.  They further

contend that, although the plaintiff suffered some irritation and discomfort from the OC

spray, he has suffered no lasting injury.  (*Id.*)  They further assert that the plaintiff's

restraint was done according to penological standards and that he was examined by

medical personnel throughout the process.  (*Id.* at 9-10).

The defendants further assert that Lt. Clifford and the other staff who were

present reasonably perceived the plaintiff's conduct as a threat to security because the

plaintiff "had shown violent and uncooperative tendencies in the past which would lead

reasonable corrections officers to conclude that a measured use of force was necessary

for the Plaintiff to comply with their lawful commands."  (*Id.* at 10).   Their

Memorandum further states:

The Plaintiff had previously threatened to damage property when
disciplinary measures were being taken due to rule violations.  (Ex. 3).  On
August 17, 2012, he was acting in a physically aggressive manner by
kicking his door with such force that the panel light came on, indicating an
unsecure door.   Mr. Rygh's actions caused security-related concerns
because he was kicking the cell door with enough force that it could result
in an escape from the cell or the destruction of state property.  (Ex. 4,
Clifford Memorandum).  Mr. Rygh was also refusing to return his lunch
tray, and Lt. Clifford was concerned that the meal tray could be used as a
weapon, potentially placing members of the staff and other prisoners in
physical danger.    (Ex. 4, Clifford Memo).     These concerns were
exacerbated by the fact that Mr. Rygh, in violation of facility rules, had
covered his cell window which prevented the officers from being able to
see inside his cell.  (Ex. 3; Ex. 4, Confidential Report, p. 2 and Clifford
Memo).  Mr. Rygh was given multiple opportunities to comply peaceably
with the orders of the corrections staff, but he refused.   Under the

19

> circumstances, it was reasonable for the officers to use that amount of
> force necessary to neutralize the threat while restoring discipline and
> minimizing risk of injury to all involved.

(*Id.* at 10).

Finally, the defendants assert that Clifford attempted to temper the situation by giving the plaintiff several opportunities to avoid, first, the deployment of the stinger grenade and, second, the OC spray, if he had complied with the orders to stop kicking his door, remove the cover from his cell window, and return his food tray. After each of these steps, Clifford repeated these orders and the plaintiff still failed to comply. The defendants assert that "the Plaintiff was given the option of coming out of his cell peaceably, but he refused, resulting in further force (the OC spray) being used to gain compliance." (ECF No. 23 at 11).

In sum, the defendants assert that a proper weighing of these factors supports a finding that the actions taken by Clifford and the extraction team were done in a good faith effort to maintain or restore discipline and order and was not done maliciously or sadistically for the very purpose of causing harm. (*Id.*)

The defendants further assert that Clifford is entitled to qualified immunity on the plaintiff's Eighth Amendment claim. Government officials are not liable for monetary damages if they can show that their conduct did not violate clearly-established statutory or constitutional rights of which a reasonable person would have known. *See Wilson v. Layne*, 526 U.S. 603, 609 (1999). Qualified immunity exists to protect officers in the performance of their duties unless they are "plainly incompetent" or they "knowingly violate the law." *Doe v. Broderick*, 225 F.3d 440, 446 (4th Cir. 2000). Furthermore, as noted by the defendants, the Supreme Court has held that "an official's actions only violate a clearly established right when 'in light of the preexisting law the

20

unlawfulness' of the subject action is apparent" *Anderson v. Creighton*, 483 U.S. 635, 640 (1987), and "in light of the specific context of the case, not a broad general proposition." *Parrish v. Cleveland*, 372 F.3d 301-02 (4th Cir. 2004). (ECF No. 23 at 11).

In ruling on an issue of qualified immunity, a court must consider this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the allegations do not give rise to a constitutional violation, no further inquiry is necessary. *Id.* If, on the other hand, a violation can be shown, then the court must determine whether the right was clearly established in the specific context of the case. *Id.* However, in *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court held that courts may decide which inquiry to address first. The *Pearson* Court noted that the doctrine of qualified immunity "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." 555 U.S. at 230. (ECF No. 23 at 12).

The defendants' Memorandum of Law asserts that Clifford is entitled to qualified immunity on the following grounds:

> Should the court find that the conduct of Lt. Clifford as procedurally deficient and conclude that a violation of a constitutional right of the Plaintiff occurred, it would be a newly created directive of this Court, and therefore not be a violation of pre-existing law contemplated in *Anderson, supra*, 483 U.S. at 640. Lt. Clifford would further not be liable for a "bad guess in a gray area" as stated in [*Maciarello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)]. Finally, as in *Parrish*, the Court must determine that the Defendant violated a right in "light of the specific context" of the Plaintiff's case, "not as a broad general proposition." *Parrish*, 372 F.3d at 301-02. As Lt. Clifford in this matter followed all material penological procedures, there is no cognizable argument that she violated an established right that she should have known that is specific to the Plaintiff's cell extraction and restraint.

On the contrary, the Plaintiff's argument suggests that the officers should have placed themselves in physical danger rather than using calculated force against him according to corrections policy. Plaintiff suggests in his Complaint that "[i]f Lt. Clifford or any officer (John Doe) wanted Plaintiff's tray they could have entered Plaintiff's cell, physically restrained the Plaintiff and took the tray and left." (Complaint, p. 8, Docket No. 2). Plaintiff's suggestion disregards the very real potential danger of physical harm to staff entering the cell of a prisoner who is admittedly as "mad as [he] could ever be," particularly given other acts of physical aggression (kicking his door) and the fact that his window was covered so that officers could not see inside. (Complaint, p. 5, Docket No. 2). Cell extraction protocol has been established not only to minimize physical injury to the inmate, but to minimize risk of injury to corrections staff while restoring discipline. The outcome of this particular case was optimal as no injuries were reported. (Ex. 4, Confidential Report, p. 2).

(ECF No. 23 at 12-13).

The defendants assert that the plaintiff has failed to point to any evidence demonstrating a violation of his constitutional or statutory rights, and that there is no clearly-established federal precedent that would have caused a reasonable correctional officer, acting under the circumstances, to believe that her conduct or that of the other correctional officers with her was inappropriate. Accordingly, the defendants assert that Clifford is entitled to qualified immunity for her actions in this case. For all of these reasons, the defendants assert that there is no genuine issue of material fact and that Clifford is entitled to judgment as a matter of law on the plaintiff's Eighth Amendment claim.

The defendants' Memorandum of Law further asserts that, should this court conclude that Clifford did not violate the plaintiff's constitutional rights, his claims against the John Doe defendants must also fail. (ECF No. 23 at 19).

*The plaintiff's Response*

The plaintiff's Response asserts that his behavior did not warrant the use of a stinger grenade or the subsequent use of OC spray.  (ECF No. 38).  The plaintiff asserts that he never said "Talking is over," and that he never threatened any officer.  (*Id.* at 4).  The plaintiff further contends that he "repeatedly tried to resolve the situation."  (*Id.*)  The plaintiff maintains that these actions violated Policy Directives 312.02 (Less-Lethal Use of Force) and 313.02 (Calculated Use of Force), and 307.00 (Use of Restraints).  (*Id.* at 4-5).  The plaintiff contends that the extraction team may have been approved to use soft control tactics but, instead, they used hard control tactics.  (*Id.* at 5).

For the first time, the plaintiff asserts that he could not hear Clifford's orders because of the loud sound of the grenade exploding, and that the OC was immediately sprayed.  (*Id.* at 5).  The plaintiff further contends that his placement in the restraint chair was solely for punishment.  (*Id.*)  Thus, the plaintiff claims that all of this conduct was malicious and sadistic and intended to cause him harm.  (*Id.*)

The plaintiff further contends that the defendants are not entitled to qualified immunity because numerous prison policies have been broken.  (*Id.* at 7).  He again asserts that he was not a threat to anyone, and that his behavior did not warrant the amount of force used.  (*Id.*)  The plaintiff further contends that, although his physical injuries were relatively minor, the conduct of the defendants caused him "dramatic mental and emotional damage."  (*Id.* at 8).  The plaintiff cites *Wilkins v. Gaddy*, 559 U.S. 34 (2010) in support of his assertion that an injury need not be significant to be actionable, if it was inflicted maliciously or sadistically.  (*Id.*)  His Response further states:

23

It is clear by the lack of respect that Lt. Clifford or the help to resolve the situation that this was done for malicious and sadistic reason. The video clearly shows that the plaintiff asked Lt. Clifford why she always "messed" with him.  From continuous cell searches, placing the plaintiff on detention at 4:00 a.m. before doing any kind of investigation for violates [sic; violations] that other inmates were found guilty of, to other incidents as the alleged.  It is further demonstrated from the other officers trying to give the plaintiff recreation and Lt. Clifford refusing their request.  Then again on video after the plaintiff was placed in the restraint chair and was being removed from the recreation yard to the multi-purpose room, Lt. Clifford taunting the plaintiff saying "see how you like this" and "where are your buddies now."

(*Id.* at 9).

The plaintiff's Response reiterates his contention that, although he was mad, he was not a threat to anyone, and that Clifford acted for sadistic reasons.  (*Id.*)  The plaintiff further asserts that the American Corrections Association Standards suggest that force should only be used as a last resort, and that leaving his cell was not essential, so the force was unnecessary.  (*Id.*)  He cites a case from the District of Maryland holding that the use of tear gas against inmates who were in a locked cell and did not need to be "quelled," could be unconstitutional punishment.  (*Id.* at 12, citing *McCargo v. Mister*, 462 F. Supp. 813, 818-19 (D. Md. 1978)("While recognizing that the use of such agents may occasionally be necessary to subdue or control inmates already confined within their cells, this Court concludes that such circumstances are, of necessity, rare.")).

The plaintiff's Response further argues:

The use of force is to be the last resorted to only after all reasonable solutions have failed.  Wouldn't it have been a better solution to give the inmate his recreation that he is required by state law being as though they still had three groups to start with and two left at the time of the incident? Wouldn't it been a lot easier to at least tell the plaintiff he was going to get his rec, then placed him in the shower, went and got the tray? The plaintiff never threatened anyone, his self or said he was going to brake [sic; break] anything.  The plaintiff's history prior to this incident speaks for itself.  He

> has never assaulted staff, himself, and has not attempted an escape.  The
> plaintiff had never "broke state property."

(ECF No. 38 at 12).

The plaintiff further asserts that "it is blatant that Lt. Clifford escalated the situation, disregarded policies, and was either incompetent to follow the policies or didn't care who she hurt in the process of her malicious and sadistic display."  (*Id.* at 11).  In fact, the plaintiff asserts that <u>he</u> should actually be awarded summary judgment on this claim.  (*Id.*)

Concerning the John Doe defendants, the plaintiff's Response makes a blanket statement that "they failed to protect the plaintiff from being abused by not stepping in and coming up with a solution that would have saved the plaintiff from being violated." (*Id.* at 13).

### *The defendants' Reply*

On August 9, 2013, the defendants filed a Reply memorandum.  (ECF No. 39).  The Reply contends that the plaintiff primarily asserts that summary judgment for the defendants should be denied because there are questions of fact regarding whether the defendants violated their own internal policies when they used force against the plaintiff on August 17, 2012.  (*Id.* at 1).  The defendants assert that all policies were followed, and that such policies, in and of themselves, do not dictate whether there was a constitutional violation.  (*Id.*)  The Reply reiterates the defendants' arguments concerning how the facts of this case warranted the force that was used under the five *Whitley* factors.  (*Id.* at 2-3).  The defendants' Reply notes that:

> Even by the Plaintiff's own version of the facts, he admits that he had
> multiple opportunities to return his meal tray, and he admits that he
> repeatedly refused to do so.  A reasonable correctional officer in Defendant
> Clifford's position could easily conclude that a use of force in order to gain

compliance is justified under those circumstances. Likewise, amount of force used was, in this case, precisely what was necessary to gain compliance of the inmate. When talking did not work, the Defendants deployed the grenade, which had no effect of gaining the compliance of the inmate. Chemical agent was used next, and there is a dispute whether it was deployed only once, or whether it was deployed twice. However, there is no dispute that the Plaintiff did not comply with orders to allow himself to be cuffed until after the second attempted deployment of OC spray, which was a successful deployment.

(*Id.* at 2).

The defendants further reiterate that the plaintiff suffered no significant physical injury and that he was immediately taken for decontamination, which is inconsistent with a malicious or sadistic intention to harm. (*Id.* at 3). Finally, the defendants reassert their argument that, although multiple forms of force were used, which incrementally increased along a force continuum, "each method was unsuccessful in gaining compliance, [and] a decision was made to utilize a different method with the aim of gaining compliance of the inmate." (*Id.* at 3).

The defendants' Reply also asserts that, to the extent the plaintiff has pointed out other interactions between himself and Clifford, those instances are not relevant to showing whether her actions and the actions of the defendants on August 17, 2012 violated the plaintiff's constitutional rights. (*Id.*) The defendants maintain that Clifford acted as a reasonable officer in her position based upon the circumstances with which she was presented and that she, and the unnamed officers acting at her command, are entitled to qualified immunity, and judgment as a matter of law.

The video evidence clearly demonstrates that the plaintiff repeatedly refused to return his food tray, which Clifford feared could be used as a weapon. Additionally, it is clear that Lt. Clifford attempted to resolve the incident and temper the need for any use of force with verbal direction before undertaking the use of force against the plaintiff.

26

Furthermore, the methods of force used were approved tools/techniques under Policy Directive 312.02, and AWS Parry gave approval for a cell extraction prior to this calculated use of force, in accordance with Policy Directive 313.02.  Moreover, the methods of force used were only progressively deployed after the plaintiff continually refused to comply with orders.  After the deployment of the OC spray, the plaintiff immediately became compliant and cuffed up for the cell extraction.  Based upon this evidence, the five *Whitley* factors weigh heavily in favor of the defendants concerning the force used prior to the extraction of the plaintiff from his cell.

Accordingly, based upon the undisputed facts viewed in the light most favorable to the plaintiff, the undersigned proposes that the presiding District Judge **FIND** that the plaintiff has not demonstrated that the deployment of the "sting ball" or "stinger" grenade and the OC spray into the plaintiff's cell was done maliciously and sadistically for the very purpose of causing harm.  Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that there is no genuine issue of material fact, and that Lt. Margaret Clifford and the John Doe defendants are entitled to judgment as a matter of law on the plaintiff's Eighth Amendment claim concerning the use of the "sting ball" or "stinger" grenade and the OC spray against the plaintiff.

Whether the placement of the plaintiff into the restraint chair for six hours was a reasonable use of force, however, is not as clear.  It is apparent from the video that the plaintiff was compliant once he was extracted from his cell.  Following the deployment of the OC spray, the plaintiff immediately agreed to cuff up and be moved from his cell. The video evidence demonstrates that, at that time, the plaintiff was not only compliant, but docile as they moved him from the cell to be decontaminated, and there is no evidence that he became non-compliant or resistant after that time.   Despite his

27

compliant behavior at that time, the plaintiff was nevertheless placed into a 4-point restraint chair for a period of six hours.

The plaintiff disputes the need for his placement in the restraint chair and claims that this action was for punishment, and not done in a good faith effort to maintain discipline.  There is a discrepancy between Lt. Clifford's affidavit which specifies that AWS Parry approved the use of the sting ball grenade and the OS spray, but fails to mention any approval of the use of the restraint chair, and her Memorandum to Chief Correctional Officer Robert Rhodes, which states that approval was also given by AWS Parry for use of the restraint chair.

Even if use of the restraint chair had been previously approved by AWS Parry at a time when the plaintiff was non-compliant, there is nothing in the record to indicate why the defendants felt justified in moving forward with the placement of the plaintiff in the restraint chair when he was clearly being compliant, a fact that the undersigned believes to be material.  Accordingly, there are unresolved material factual issues concerning the need for the use of the restraint chair under the circumstances.

Thus, the undersigned proposes that the presiding District Judge **FIND** that there is a genuine issue of material fact concerning the placement of the plaintiff in the restraint chair for six hours, and that the defendants are not entitled to summary judgment on that limited aspect of the plaintiff's Eighth Amendment claim.[2]

---

[2]  If the presiding District Judge determines, however, that the facts of record warrant a finding that the placement of the plaintiff in the restraint chair was done in a good faith effort to maintain or restore discipline and order, it appears that the conditions under which the plaintiff was held in the restraint chair were not otherwise malicious or sadistic, as he was permitted to use the bathroom and eat and was regularly examined for discomfort.

**B.      The claims against defendants Ballard and Rubenstein.**

The defendants' Motion for Summary Judgment (ECF No. 22) and Memorandum in support thereof (ECF No. 23) also address the plaintiff's claims of supervisory liability against defendants Ballard and Rubenstein.  The Memorandum of Law states:

> Plaintiff's Complaint seeks to hold Warden David Ballard and Commissioner Jim Rubenstein liable under a theory of supervisory liability because  they allegedly ignored grievances complaining of alleged unconstitutional conduct, which he argues indicated a tacit approval and deliberate indifference to the same.  Plaintiff has not alleged that Warden Ballard or Commissioner Rubenstein personally engaged in any use of force against them.

(ECF No. 23 at 17).

In *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994), the Court held that supervisors may be liable for the actions of their subordinates where the supervisor, by his own conduct, was deliberately indifferent to, or tacitly authorized or approved prior constitutional violations.  Such liability is not based on *respondeat superior*, but rather upon "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care."  13 F.3d at 798 (*quoting Slakan v. Porter*, 737 F.2d 368 (4th Cir. 1984).  The *Shaw* Court identified the following elements necessary to establish a supervisor's liability under 42 U.S.C. § 1983:

> 1)      The supervisor had actual constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive  and unreasonable risk" of constitutional injury to citizens like the plaintiff;
>
> 2)      The supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit  authorization  of the alleged offensive practices," and

3)      There was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injuries suffered by the plaintiff.

13 F.3d at 799.

Defendants Ballard and Rubenstein assert that the plaintiff failed to allege facts that would show that either Ballard or Rubenstein had any actual or constructive knowledge of any conduct that posed a pervasive or unreasonable risk of constitutional injury to the plaintiff, or that they failed to act to prevent the same.  (ECF No. 23 at 18). They further assert that the facts in the record do not support any causal connection between other grievances reviewed by Ballard and Rubenstein and the actions taken by correctional staff in response to the plaintiff's behavior on August 17, 2012.   (*Id.*)

Moreover, they assert that, because Lt. Clifford did not violate the plaintiff's constitutional rights, there is no basis for supervisory liability in this case.  (*Id.* at 19). Accordingly, defendants Ballard and Rubenstein maintain that they are entitled to qualified immunity and must be granted judgment as a matter of law on the plaintiff's claims against them.   (*Id.*)

The plaintiff's Response asserts that "it is clear that [defendants Ballard and Rubenstein] had prior knowledge that this action was being held in many other extraction[s]" and that he "was not the first this tactic was used on."  (ECF No. 38 at 13).

The defendants' Reply reiterates their contention that there was no constitutional violation by Lt. Clifford and the officers under her command; thus, all of the defendants are entitled to judgment as a matter of law.  (ECF No. 39 at 3-4).

Even taken in the light most favorable to the plaintiff, these facts are speculative and do not demonstrate actual or constructive knowledge of a pervasive risk of harm by defendants Ballard and Rubenstein sufficient to establish a claim of supervisory liability

30

on the plaintiff's Eighth Amendment claims.  Moreover, if the presiding District Judge **FINDS** that there was no constitutional violation by Lt. Clifford and the extraction team, there is no basis for a supervisory liability claim against defendants Ballard and Rubenstein.  Accordingly, the undersigned proposes that the presiding District Judge **FIND** that there is no genuine issue of material fact and that defendants Ballard and Rubenstein are entitled to judgment as a matter of law on the plaintiff's claims against them.

### C.    The plaintiff's claimed violations of other constitutional rights.

The defendants' Memorandum of Law also addresses the plaintiff's claims that the conduct of these defendants also violated his rights under the First, Fifth, Sixth and Fourteenth Amendments to the United States Constitution.  The defendants assert that the nature of the plaintiff's claims most appropriately falls under the Eighth Amendment.  They further assert that the plaintiff's Complaint does not articulate the bases of, or any factual support for, any of the other various constitutional rights he claims have been violated.  (ECF No. 23 at 14).  Nevertheless, the defendants have attempted to address each claim in turn.

The defendants assert that the plaintiff's allegations do not in any way implicate the plaintiff's First Amendment rights, which concern the exercise of religion, freedom of speech, freedom of the press, the right to peaceably assemble and the right to petition the government for redress of grievances.  (ECF No. 23 at 15).  In his Response, the plaintiff appears to contend that his right to peaceably assemble was violated because he was denied recreation.  (ECF No. 38 at 14).  This assertion is completely frivolous.

Likewise, the defendants asset that the plaintiff cannot establish a violation of his Sixth Amendment rights, which governs the right to assistance of counsel in a criminal

proceeding.  (ECF No. 23 at 16).  The plaintiff's Response asserts that he was denied the right to meet with a mental health counselor.  (ECF No. 38 at 14).  Again this assertion is inapposite and patently frivolous.

The defendants further assert that the plaintiff cannot establish any violations of his rights under the Fifth and Fourteenth Amendments.  As noted by the defendants, the Fifth Amendment provides various protections for individuals being accused of a crime, such as protections against double jeopardy and the preservation of a defendant's right not to testify in a criminal trial or to otherwise incriminate him or herself.  These issues are totally inapposite in this matter.

Thus, the one remaining allegation is the plaintiff's claim that the defendants' conduct violated his Fourteenth Amendment rights, which govern the right to procedural and substantive due process and equal protection.  In the prison context, a liberty interest is created by the imposition of an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).  As noted by the defendants in their Memorandum of Law:

> The Due Process Clause standing alone confers no liberty interest in freedom from state action taken "within the sentence imposed." *Sandin v. Conner*, 515 U.S. 472, 115 S. Ct. 2293, 132 L. Ed.2d 418 (1995), *quoting Hewitt v. Helms*, 459 U.S. 460, 468 (1983)(overruled in part by *Sandin v. Conner, supra*).  The United States Supreme Court in *Sandin* rejected the notion that any state action taken for a punitive reason encroaches upon a liberty interest.  *Sandin*, 515 U.S. at 484, 115 S. Ct. at 2300, 132 L. Ed.2d at 430.  To the contrary, the Court found that the punishment of incarcerated prisoners serves different aims than those actions held to be invalid in other cases.  *Id.* 515 U.S. at 485, 115 S. Ct. at 2301, 132 L.Ed.2d at 430.  The Court found that punishment in a prison setting "effectuates prison management and prisoner rehabilitative goals."  *Id.* 515 U.S. at 485, 115 S. Ct. at 2301, 132 L. Ed.2d at 430-31.  * * * The Court concluded that "[d]iscipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law.  *Sandin*, 515 U.S. at 485, 115 S. Ct. at 2301, 132 L. Ed.2d at 431.  Only those actions that presented an "atypical, significant deprivation" would

even conceivably implicate a liberty interest. *Sandin,* 515 U.S. at 486, 115 S. Ct. at 2301, 132 L. Ed.2d at 431.

      In this case, Mr. Rygh has not been exposed to any "atypical, significant deprivation" in which he may conceivably have a liberty interest. Instead, the actions taken by prison staff fall within the expected parameters of Mr. Rygh's prison sentence. Therefore, the discipline of which he is complaining did not give rise to a constitutional right to procedural due process.

(ECF No. 23 at 16-17). The defendants further assert that the actions of Lt. Clifford were rationally related to the penological goal of restoring order and discipline and, thus, did not constitute a violation of the plaintiff's substantive due process rights. (*Id.*)

The fact that the plaintiff was being housed on the Quilliams II unit and the disciplinary process that led to him being there are not at issue in this case. Moreover, the plaintiff has not alleged any facts that would indicate that his conditions of confinement imposed an atypical and significant hardship in relation to ordinary prison life. Thus, the plaintiff cannot successfully allege any claims concerning his procedural or substantive due process rights.

Although not specifically addressed in the defendants' Memorandum, the undersigned notes that the plaintiff also summarily alleges a violation of his right to equal protection of law under the Fourteenth Amendment. (ECF No. 2 at 25). His Complaint and his Response to the defendants' Motion for Summary Judgment do not elaborate on this contention. Accordingly, the plaintiff cannot successfully allege any violation of his equal protections rights either.

The undersigned views this case as exclusively implicating the plaintiff's Eighth Amendment right to be free from cruel and unusual punishment. The undersigned proposes that the presiding District Judge **FIND** that the plaintiff's Complaint fails to state a claim upon which relief can be granted under the First, Fifth, Sixth and

Fourteenth Amendments, and that his claims alleging such violations should be resolved as a matter of law in favor of the defendants.

## RECOMMENDATION

It is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** the defendants' Motion for Summary Judgment (ECF No. 22) with regard to the plaintiff's Eighth Amendment claim concerning all uses of force until he was removed from his cell,  his First, Fifth, Sixth and Fourteenth Amendment claims, and his claims of supervisory liability.  However, it is further respectfully **RECOMMENDED** that the presiding District Judge **DENY** the Motion for Summary Judgment (ECF No. 22) with regard to the plaintiff's Eighth Amendment claim concerning the placement of the plaintiff in a restraint chair for six hours.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (service/mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the district court and a waiver of appellate review by the circuit court of appeals.  <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474

U.S. 140, 155 (1985); <u>Wright v. Collins</u>, 766 F.2d 841, 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on the opposing party and Judge Copenhaver.

The Clerk is directed to file this Proposed Findings and Recommendation, to mail a copy to the plaintiff and to transmit a copy to counsel of record.

<u>February 21, 2014</u>

Dwane L. Tinsley
United States Magistrate Judge

35